# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕱𝖊𝖉𝖊𝖗𝖆𝖑 𝕮𝖑𝖆𝖎𝖒𝖘

No. 20-1936C
(Filed: March 18, 2021)
(Re-Filed: April 6, 2021)[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ROCKY MOUNTAIN MOBILE MEDICAL,

       *Plaintiff,*

v.

THE UNITED STATES,

       *Defendant,*

and

MEDEXPRESS AMBULANCE SERVICES, INC.,

       *Intervenor.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Bid protest; pre-award bid protest; FAR 13.106-3(a) (2008); exchanges; best value determination.

    *Shaun C. Kennedy*, Denver, CO, for plaintiff, with whom was *Thomas A. Morales and Hannah E. Armentrout*, of counsel.

    *Geoffrey M. Long*, Trial Attorney, United States Department of Justice, Civil Division, with whom were *Brian M. Boynton*, Acting Assistant Attorney General*, Robert E. Kirschman, Jr.*, Director, and *Douglas K. Mickle*, Assistant Director, for defendant.  *Maj. Laura B. Bauza*, United States Air Force, of counsel.

    *Bradley L. Drell*, Alexandria, LA, for intervenor.

---

[1] This opinion was originally issued under seal in order to afford the parties an opportunity to propose redactions of protected material.  The parties filed a joint document with proposed redactions on April 1, 2021 (ECF No. 49). We thus reissue this opinion with the proposed redactions.

<u>OPINION</u>

BRUGGINK, *Judge.*

In this post-award bid protest, Rocky Mountain Mobile Medical ("RMMM"), alleges that the U.S. Department of the Air Force, U.S. Space Force (the "Air Force") failed to conduct a fair and rational evaluation of each offeror's quotation in accordance with the solicitation and the Federal Acquisition Regulation ("FAR"), resulting in a flawed contract award decision. Plaintiff filed a motion for judgment on the administrative record on January 22, 2021. Plaintiff seeks a permanent injunction preventing the agency and intervenor, MedExpress Ambulance Services, Inc. ("MedExpress") from commencing performance on the contract, requiring the agency to conduct a reevaluation of quotations in accordance with the solicitation, and requiring the agency to create a new award determination. The government and intervenor filed their respective responses and the government also filed a cross-motion for judgment on the administrative record, all of which are fully briefed.

Oral argument was held on March 12, 2021. Because the agency properly documented its decision and its analysis was reasonable, we grant defendant's motion for judgment on the administrative record and deny plaintiff's motion.

BACKGROUND[2]

On May 8, 2020, the Air Force issued a solicitation seeking quotations from contractors to perform ambulance services at two military installations in Colorado Springs, Colorado, Peterson Air Force Base ("PAFB") and Schriever Air Force Base ("SAFB"). The contract was for a twelve-month base year and four twelve-month option years, including a pre-priced 6-month extension of services. The agency set aside the solicitation as "100% For Small Business." Solicitation, AR 43 (ECF No. 34 at 43).

According to the representations made by the parties during the status conference held on December 23, 2020, it is apparent that plaintiff formerly served as the incumbent on the SAFB military installation contract. Following the agency's award of this contract to MedExpress and plaintiff's subsequent GAO protest, however, the agency elected to utilize a third-party bridge contract to service that base during the pendency of this protest.

---

[2] The facts in the background are derived from the administrative record (ECF No. 34).

Additionally, the second location, the PAFB military installation contract, is currently being serviced by another contractor.

The solicitation stated that the agency would select the quote providing the best value to the government considering technical capability, past performance, and price. The solicitation also allowed the government to perform a tradeoff between past performance and price, if it determined that to be justifiable and if it would result in providing the best value to the government. AR 256.

The Air Force indicated in the solicitation that this would be "a competitive selection conducted in accordance with [FAR] 13.106-2(b)(3)." AR 258. There was no indication in the solicitation that FAR Part 15 procedures would be used. Though not included in the solicitation, the Air Force checked boxes in the streamlined acquisition strategy summary ("SASS") indicating that it would use the procedures of FAR Part 13 entitled, "Simplified Acquisition Procedures ("SAP")," but did not check the box that would indicate that it was using FAR 15 procedures. AR 458. In the SASS, the agency gave its reasoning for selecting FAR 13 procedures and stated that because the "acquisition is less than $7M," it would be able to utilize the SAP described in FAR Part 13. AR 458. Although, as plaintiff points out, the solicitation notified bidders that "exchanges" might be "conducted with one, some, or all offerors," the term exchanges does not appear in FAR Part 13, but it does appear in FAR Part 15. AR 258.

Offerors were required to submit proposals in three separate volumes—technical capability, past performance, and price. The evaluation was based upon the ratings of these three factors. Technical capability was evaluated on a pass/fail basis. It was comprised of two subfactors, staffing and response time. To receive a "pass" rating for the technical capability factor, both of its subfactors had to receive a "pass" rating. If a proposal received a "fail" rating for either subfactor, then the proposal was not considered for award. A proposal's technical capability had to receive a "pass" rating to proceed to the past performance and price evaluation. This volume was not to exceed six pages double-spaced, excluding a table depicting the staffing plan.

Past performance was assessed on an overall performance confidence rating including "substantial confidence," "satisfactory confidence," "neutral confidence," "limited confidence," or "no confidence." AR 257. The solicitation required offerors to submit two recent past performance reference citations. For each past performance reference citation, the agency assigned recency, relevancy and quality ratings. The solicitation defined recency as

"work completed or ongoing during the 3 years prior to the solicitation issuance of 08 May 2020." AR 255. After evaluating the recency of a past performance, the agency would then assign a "recent" or "not recent" rating. If a past performance reference received a "not recent" rating, then it would not be evaluated for relevancy or quality, and the reference would not receive an overall performance confidence rating.

The solicitation defined relevancy "as a present or past performance effort involving similar scope, magnitude, and complexity of effort as this solicitation." AR 256. If a past performance reference received a "not relevant" rating, then the evaluation process was to end at that point, and the reference would not be evaluated for quality or given an overall performance confidence rating.

The quality assessment was based upon past performance reference citations, the quality assessment definitions listed in table one of the solicitation, and information independently obtained by the Contracting Officer ("CO"). The agency then assigned an overall performance confidence rating based upon the definitions listed on Table two of the solicitation. AR 257.

Price was evaluated in accordance with FAR 13.106-3(a) (2008), after the technical and past performance evaluations, to determine if the proposed price was reasonable and balanced. The solicitation required offerors to submit a firm-fixed price quote and detailed pricing data specifying the unit price and the extended amount for each contract line item number.

A. Evaluation

On July 7, 2020, the submission deadline, the agency received six proposals from six different offerors: Contractor A, RMMM, MedExpress, Contractor D, Contractor E, and Contractor F.

The agency completed a preliminary review of all six offers for compliance with the solicitation instructions and initially found that three of the six were "non-compliant," including Contractor D, Contractor F, and Contractor A.[3] AR 491. "Exchange notices" were sent to these three

---

[3] Contractor D had pricing inconsistencies (essentially rounding errors) that were resolved. Contractor F did not submit any past performance references and stated they did not have DoD experience, but submitted two (2) non-DoD references as a result of the exchanges. Contractor A had rounding issues with pricing and technical volume was more than six (6), which

offerors, however, and all six offers were considered compliant after the issues were resolved.   RMMM argues that these exchanges were an indication that the agency elected to use elements of FAR Part 15.

MedExpress also included a three-page introduction letter along with its technical submission.  Because the package collectively exceeded the six page limit, the Contracting Officer, Ms. Sheri L. Burks (" CO") removed the introductory material before forwarding the technical capability volume for evaluation.  RMMM contends that MedExpress's inclusion of the three-page introductory letter rendered its submission non-compliant and that its submission should have been excluded; that it was error for the CO to simply remove the introductory letter.

The agency convened a Technical Evaluation Team ("TET") to evaluate the technical capability of each quotation on a "pass/fail" basis. With the exception of Contractor A, all the offerors received an overall rating for both subfactors of "pass."  Contractor A received a "fail" rating for not meeting the response time requirements, making it ineligible for award.

The CO then evaluated the remaining five quotes for past performance and price.   Both Contractor D and MedExpress received an overall "substantial confidence" rating. RMMM received an overall "satisfactory confidence" rating.  Contractor E received an overall "neutral confidence" rating, and Contractor F was not rated because the references it provided were not deemed relevant in accordance with the solicitation's definition for relevancy.   The CO's evaluation of each offeror's past performance is depicted in table one below:

| Table 1: Past Performance Evaluation | | | | | |
|---|---|---|---|---|---|
| Offeror | Recency Per Citation | | Relevancy Per Citation | | Quality Rating Per Citation | Overall Confidence Rating |
| RMMM | Ref 1 | Yes | Ref 1 | Yes | Marginal | Satisfactory Confidence |
| | Ref 2 | Yes | Ref 2 | Yes | Satisfactory | |
| | CPARS | Yes | CPARS | Yes | Satisfactory | |
| | CPARS | Yes | CPARS | Yes | Satisfactory | |
| Contractor D | Ref 1 | Yes | Ref 1 | Yes | Exceptional | Substantial Confidence |
| | Ref 2 | Yes | Ref 2 | No | Not Rated | |

exceeded the page limit per the instructions in 52.212-1 but corrected the pricing and technical volume to six (6) pages after exchanges."  AR 491.

| | | | | | | |
|---|---|---|---|---|---|---|
| MedExpress | Ref 1 | Yes | Ref 1 | Yes | Exceptional | Substantial Confidence |
| | Ref 2 | Yes | Ref 2 | Yes | Satisfactory | |
| | CPARS | Yes | CPARS | Yes | Exceptional | |
| Contractor E | Ref 1 | Yes | Ref 1 | Yes | Satisfactory | Neutral Confidence |
| | Ref 2 | Non-Responsive | Ref 2 | Non-Responsive | Non-Rated (Non-Responsive) | |
| Contractor F | Ref 1 | Yes | Ref 1 | No | Not Rated | Not Rated |
| | Ref 2 | Yes | Ref 2 | No | Not Rated | |

AR 498.

MedExpress received an overall "substantial confidence" rating based on information provided by the references and/or information available in the Contractor Performance Assessment Reporting System ("CPARS") reports or the Past Performance Information Retrieval System ("PPIRS") reports as part of an independent Government assessment. The CO found that MedExpress had "exceptional" and "satisfactory" quality ratings, allowing the government to have confidence in the contractor's ability to successfully perform the contract. MedExpress submitted two references, both of which the CO determined were "recent" and "relevant" reference citations. Both references stated that MedExpress was an excellent partner and that they would award another contract to MedExpress. Additionally, the CO found that the contractor never provided services using expired vehicle permits, nor experienced staffing issues or delays. The CO also found that all of MedExpress's quality ratings were "satisfactory" or "exceptional," resulting in an overall "substantial confidence" rating. RMMM takes issue with the overall confidence rating assigned to MedExpress, contending that it should have been no higher than "neutral."

MedExpress's first reference was for an ambulance services contract at Creech Air Force Base in Nevada. The reference for this contract was [ ], the CO for the contract at Creech Air Force Base, who gave the following response to the question, "Has there ever been a time when the contractor did not have current employee certifications or vehicle permits?": "No; there has not been anytime that contractor did not have current employee certifications or vehicle permits." AR 495. She also gave the following response to the question, "Would you award another contract to this contractor? Why/why not?": "Yes; Definitely would award another contract to this contractor. Their support to Creech EMS has been an outstanding partner." AR 495.

MedExpress's second reference was for its contract for ambulance services with the Louisiana Rural Ambulance Alliance, Inc. ("LRAA"), in which it provided "emergency medical response in the form of ambulance and/or personnel in times of disaster and in cooperation with Federal, State, and Local Governments." AR 489. MedExpress further explained that it had performed "[m]ost recently to respond to the COVID pandemic in the New Orleans, Louisiana area." AR 489. The contract type was indicated as firm-fixed-price at [     ] per day, and the contract was awarded competitively in 2017 with performance ongoing. AR 489. MedExpress also submitted information that the LRAA contract's annual dollar amount was "[to be determined], 2020 [year to date]: [     ]." AR 831.

The Air Force solicited further information about the LRAA contract from [          ], the CEO of LRAA. [          ] gave the following response to the question, "Did the contractor exhibit/experience staffing issues or delays during performance?": "Med Express has never experienced staffing issues or delays during performance. Med Express has consistently performed above expectations and provided leadership for not only Med Express crews but for other services responding." AR 495.

[          ] also gave the following response for MedExpress to the question, "Has there ever been a time when the contractor did not have current employee certifications or vehicle permits?": "We have activated our contract with Med Express over seven times in the last 3 years; for every response/event MedExpress has always had current employee certifications and vehicle permits." AR 495. Additionally, the CPARS report for MedExpress from September 2018 to September 2019 reflected "exceptional" ratings in quality, schedule, and management.

Contractor D received an overall "substantial confidence" rating based on information provided by the references and/or information available in CPARS/PPIRS reports as part of an independent Government assessment. Similar to the past performance citations that MedExpress received, Contractor D also received high praise in responses from its three references. Although only one of the references cited was considered "relevant," overall the quality rating provided for the recent and relevant reference citation was exceptional, leading to a "substantial confidence" rating overall. RMMM argues that this was error; that Contractor D should have been excluded because only one of its references was found to be relevant.

RMMM received an overall "satisfactory confidence" rating based upon information provided by the references and information available in CPARS/PPIRS reports as part of an independent Government assessment.

RMMM received a "marginal" quality rating for its services at SAFB because the contractor provided these services using ambulance vehicles with expired permits and unpermitted vehicles.   Additionally, after an inspection that occurred in May 2020, the government found that RMMM used "expired supplies, medications, and missing equipment vital to emergency services."  AR 499.  Although these deficiencies were corrected in about three weeks during RMMM's contract with SAFB, these issues lowered the government's confidence that RMMM could successfully perform medical services according to solicitation requirements.  RMMM argues that it should have been afforded the opportunity through "exchanges" to provide ameliorating information and that not receiving that opportunity was prejudicial error.

RMMM offered two reference citations, the first reference was from its contract at the SAFB, and was submitted by [          ], a CO at this Air Force Base.  He gave the following response to the question, "Would you award another contract to this contractor? Why/why not?":

> No, after an anonymous tip from a former employee a thorough inspection was conducted for the contract. That inspection showed that the contractor had been using expired medical equipment to perform services on Schriever AFB. Attached is a copy of the cure notice that was provided to the contractor. Due to the contractor's previous discrepancies, Schriever AFB has been conducting more thorough and frequent inspections to ensure the contractor is continuing to perform contractually. The contractor did cure their deficiencies, but the confidence that we had in their ability to protect Schriever was greatly diminished.

AR 496.  A response by the same reference to the question, "Has there ever been a time when the contractor did not have current employee certifications or vehicle permits?" was as follows: "Yes; there was an ambulance that expired April 2019, Feb 2019, and an ambulance that was never permitted."   AR 496.   Although RMMM had been given the opportunity to address the negative past performance references and cured the discrepancies noted while completing its contract at SAFB, the Air Force's confidence in the contractor's ability to successfully perform was impacted according to the reference citation.  The quality rating assigned for that reference citation was "marginal."

The second reference was from its contract at the United States Air Force Academy ("USAFA") in Colorado Springs, CO, and was submitted by

[        ], a contracting specialist at this location. [    ] gave the following response to the question, "Would you award another contract to this contractor? Why/why not?": "Yes, they have proven to perform in an environment that is not without risk and demands customer satisfaction. While I would always encourage competition to check the market conditions, they have in previous acquisitions for USAFA presented economical and satisfactory performance over time." AR 496. A response by the same reference to the question, "Did the contractor exhibit/experience staffing issues or delays during performance?" was as follows: "Never to the point of jeopardizing the mission, had few to no corrective action reports over previous and current contract which were immediately addressed. Appears to be normal management/staff turnover and associated learning curve that comes with this turnover." AR 496. The quality rating assigned for that reference citation was "satisfactory."

Additionally, the CPARS assessed for contract FA700014C0009 for the period Oct 2018-Mar 2019 reflected a "satisfactory" in quality, a "marginal" in schedule, and a "satisfactory" in management for a satisfactory quality rating for that citation. The CPARS assessed for contract FA255016C0001 for the period Oct 2018-Sept 2019 reflected a "satisfactory" in quality, a "satisfactory" in schedule, and a "satisfactory" in management, with an overall "satisfactory" quality rating for that citation.

Finally, the CO evaluated price in accordance with FAR 13.106-3(a) to determine if the offeror's quoted price was reasonable and balanced. Because the solicitation states that price will only be assessed on quotes that received a "pass" rating for both technical subfactors, only the five quotes which received a "pass" in technical capability were evaluated for price:

| Table 2: Price Evaluation | | | | | |
|---|---|---|---|---|---|
| Offeror | Technical Capability | Quality Rating Per Citation | Overall Confidence Assessment Rating | Total Price | Difference in Price compared to the IGE |
| [  ] | [  ] | [  ] | [  ] | [  ] | [  ] |
| RMMM | PASS | Marginal, Sat, Sat, & Sat | Satisfactory Confidence | $4,677,600.00 | [    ] |
| Contractor D | PASS | Exceptional & Not Rated | Substantial Confidence | [  ] | [  ] |
| MedExpress | PASS | Exceptional, Sat, & Exceptional | Substantial Confidence | $5,282,100.00 | [  ] |

| Contractor E | PASS | Sat & Non-Rated (Non-Responsive) | Neutral Confidence | [    ] | [    ] |
|---|---|---|---|---|---|
| Contractor F | PASS | Not Rated & Not Rated | Not Rated | [    ] | [    ] |

AR 500.

The CO conducted a price analysis comparing MedExpress's quoted priced to the Independent Government Estimate ("IGE") for the base period and all option years, which also included the pre-priced 6-month extension. She found that MedExpress's prices for the base period was [      ] than the IGE of [          ] and [      ] for the option years.  In conclusion, the CO determined that MedExpress's evaluated price of $5,282,100.00 was fair and reasonable in accordance with FAR 13.103-3(a)(1).

The CO stated that the solicitation allows the government to select an offer providing the best value considering all three factors.  In her best value analysis, the CO stated that although the technical and past performance factors, when combined, are approximately equal to price, the solicitation allows the government to perform a tradeoff between past performance and price, if it determines that it is justifiable and will result in the best value for the government.  Here, the CO found that although MedExpress's price was higher than RMMM's total price, MedExpress provided a higher overall performance confidence rating warranting a tradeoff with RMMM, which provided a lower overall performance confidence rating.

The CO determined that significant value for the agency in terms of quality, schedule, and management exists between the past performance "satisfactory" and "substantial confidence" ratings, and thus, she found that paying slightly more for higher past performance ratings constituted  the best value for the government.[4]  The CO concluded that paying an additional

---

[4] The CO explained that a contractor receiving a "substantial confidence" rating, with documented excellent past performance, gives the government confidence that "there is little to low risk in operations, compliance, legal, quality, and unsuccessful performance of these vital, life-saving, mission essential, emergency services."  AR 499.  She also stated that a "satisfactory confidence" rating gives the government "a reasonable expectation that [the contractor] can perform these critical lifesaving services, however," because issues exist with the contract, the government has questions regarding whether the contractor would be successful in executing the contract.  AR 499.

$604,500.00 over the course of five years of performance on the contract (the difference between $4,677,600.00 and $5,282,100.00), an additional $120,900 per year, was justifiable in view of the appreciable difference in past performance ratings.  This represented less than a 13% difference over the contract's lifetime.  The CO found, however, that performing a similar tradeoff between RMMM and Contractor D was not necessary.  Contractor D's quoted price was $1,404,312.00 more than RMMM's, while both Contractor D and MedExpress received the same "substantial confidence" rating.

MedExpress's past performance evaluation showed that it filled all required positions on time with the "necessary education, experience and all required certifications/licensing in accordance with the contract requirement and specifications 97% of the time during performance."  AR 498. MedExpress was evaluated as "very responsive when it comes to responding to any issues or concerns 95% of the time as well as very professional and adheres to what is required to provide continued mission support."  AR 498. The CO noted that the contractor was reported as actively responding to concerns with personnel to prevent any service issues within its control 98% of the time, and that MedExpress complied with regulations and proactively communicated regarding questions and concerns during performance. Because MedExpress's past performance was exceptional, she concluded that the government could be confident that it would meet and exceed the contract requirements concerning quality, schedule, and management.

B.  Exchanges Prior to Award

The solicitation stated that the agency was not required to conduct exchanges with all offerors, but that exchanges might be conducted with "one, some, or all offerors." AR 258. The Air Force did in fact conduct what it characterized as exchanges prior to award, but only with Contractor F and Contractor A, regarding discrepancies with their respective quotes. The Air Force advised Contractor F that its quote failed to comply with the solicitation in that it did not submit past performance references as required by solicitation Addendum 52.212-1, section 1.4.  AR 526. Although Contractor F submitted a past performance narrative, it failed to include the required references.  Contractor F responded to the exchange notice that same day and provided the two past performance references.  On July 16, 2020, the agency sent Contractor F a second exchange notice asking it to address the technical acceptability requirement by providing a single-page explanation of how it would ensure employee compliance with certifications and licenses during contract performance.  Contractor F furnished a single-page response.

On July 17, 2020, the Air Force sent a third exchange notice to Contractor F, concerning the technical acceptability of Contractor F's quote. The agency notified Contractor F that its quote was deficient because it "restate[d] the requirement(s), [and] mention[ed] training, but [did] not include a clear approach for meeting the 8-minute response time." AR 539. Contractor F was permitted to submit a single-page response to correct this discrepancy, which it did on July 20, 2020.

On July 7, 2020, the agency notified Contractor A that its technical capability volume exceeded the six-page limit and that its prices were not rounded to the nearest dollar. Contractor A submitted a revised technical capability volume and corrected its pricing. The agency sent a second exchange notice to Contractor A on July 16, 2020, stating that its quote was deficient because it failed to provide a plan to meet the eight-minute response time requirement. Contractor A responded the next day. Contractor A's revised approach still did not meet the response time requirements and it later withdrew from the competition.

RMMM contends that, like Contractor F and Contractor A, it should have been notified of the agency's concerns about its own past performance references. If it had been, it argues, RMMM could have explained or corrected the problems.

C. RMMM's Protest at GAO

On September 17, 2020, the Air Force notified RMMM that its quote was not selected for award. RMMM filed a protest with the Government Accountability Office ("GAO") on September 24, 2020. The basis for its challenge was that the agency allowed MedExpress's technical volume to exceed the page limit and because its evaluation of past performance was unreasonable. RMMM argued that the agency should have ignored everything after the first six pages of the technical proposal, including the three-page introduction letter, effectively proposing that half the technical proposal be ignored. GAO dismissed the protest on December 16, 2020, concluding that the agency could and did sever MedExpress's introductory letter from the technical capability volume; it was not necessary to consider only the three-page letter of introduction and the first three pages of the awardee's technical quotation. *Rocky Mountain Mobile Med.*, B-418788.2, 2020 WL 7698817 (Comp. Gen. Dec. 23, 2020). The GAO also found that the Air Force was reasonable in its evaluation of RMMM's past performance references. *Id.*

On September 17, 2020, the Air Force notified MedExpress that it would be the awardee.  Rocky Mountain filed its bid protest here on December 21, 2020.  Award has not yet occurred, pending resolution of this protest.

DISCUSSION

Our review is deferential in accordance with the standard set forth in the Administrative Procedures Act, 5 U.S.C. § 706, which is to say that we review agency action in a procurement for illegality and a lack of rationality. *Impressa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001).  So long as the agency's decision was not irrational or otherwise illegal, we will leave it undisturbed.

RMMM brings four challenges:  (1) the agency was required to, but did not, conduct discussions with RMMM to address adverse past performance information; (2) MedExpress's technical capability volume should have been excluded as noncompliant; (3) the agency's overall performance confidence rating was irrational because it incorrectly concluded that MedExpress's LRAA past performance reference was "relevant"; (4) the agency treated RMMM unequally by relaxing its past performance evaluation of Contractor D and assigning it an overall past performance assessment of "substantial confidence," rather than "neutral confidence," despite the fact that Contractor D only had one relevant past performance reference.  Plaintiff seeks permanent injunctive relief to enjoin the Air Force from continuing its award to MedExpress.

When considering whether to grant a permanent injunction, the court must consider whether "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief."  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).  Although an award of injunctive relief is based on consideration of this four-factor test, failure to achieve success on the merits is dispositive. *See Career Training Concepts, Inc. v. United States*, 83 Fed. Cl. 215, 219 (2008) ("[A] permanent injunction requires actual success on the merits."). For the reasons below, we find that all four of plaintiff's challenges lack merit and it is therefore unnecessary to consider the last three factors.  We consider each of plaintiff's arguments in turn.

A. The Air Force Reasonably Conducted Exchanges with Offerors by Following the Simplified Acquisition Procedures of FAR Part 13

RMMM argues that the Air Force failed to conduct discussions in accordance with FAR 15.306 and FAR 15.307, and thus, the agency's evaluation was arbitrary and capricious. Although plaintiff acknowledges that the solicitation was issued under FAR Part 13 procedures, and that these procedures provided the agency more flexibility than FAR Part 15, it argues that by conducting exchanges with some offerors, the agency signaled its intent to incorporate elements of FAR Part 15 generally. Thus, once the agency elected to exercise its right to conduct discussions under the SAP of FAR Part 13, the agency was obligated to comply with both the procedural requirements of FAR 15.306 and FAR 15.307.

There is no question that the agency engaged in what it termed exchanges with two of the offerors, and that such exchanges are more typically associated with FAR Part 15 procedures. Indeed, there is no reference to them in FAR Part 13. As plaintiff points out, FAR Part 13 gives the contracting officer broad discretion in fashioning suitable evaluation procedures, including the possibility of incorporating procedures prescribed in Parts 14 and 15. FAR 13.106-2(b)(1). RMMM's argument is that, having chosen, in effect to exercise this option, the agency did not go far enough and failed to apply the exchange process to plaintiff.

RMMM argues that what the agency did was conduct discussions under FAR 15.306(d)(3) which requires the CO to "indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." FAR 15.306(d)(3). Having done so, it argues that the agency's communications were unequal because the agency did not disclose adverse past performance deficiencies to RMMM and did not permit it to explain the deficiencies. [5] RMMM also argues that the discussions violated FAR 15.307(b) which requires that each contractor

---

[5] RMMM claims that, contrary to [     ] response, it maintained the Colorado Department of Revenue Emergency Vehicle Equipment Authorization and El Paso County Board of County Commissioners Ambulance Service License without lapse. RMMM states that it would have "further explained that the local El Paso County permit referenced by [          ] did not even apply to Rocky Mountain's performance of the SAFB contract." Pl's Mem. at 34. Plaintiff adds that it would have also explained mitigating information, that the expired medical supplies referred to in [     ] response are included on the U.S. Federal Drug Administration's Drug Shortage List because of a supply chain shortage caused by the COVID pandemic.

"be given an opportunity to submit a final proposal revision" at the conclusion of discussions.  FAR 15.307(b).

The most basic difficulty with plaintiff's argument is that the agency did precisely what it advertised it would do: have exchanges with some but not all bidders.  There is a clear warning in the solicitation that the agency reserved the right to conduct "exchanges" with some, all, or none of the bidders.  RMMM thus got precisely what it gambled on.[6]  If, as plaintiff argues, the possibility of exchanges would seem to be a reference to FAR Part 15, the agency simultaneously disavowed such an intent by stating that such communications could be with a limited number of bidders, which, as plaintiff currently argues, was something the agency did not have the option of doing.  Plaintiff contends that the exchanges actually held were conducted pursuant to 15.306(d), which specifically requires access by all bidders to the exchange process.

In addition, if RMMM thought that the agency's description of potential exchanges was inconsistent with FAR Part 15, the time to complain of that was prior to bidding. [7]  While it argues that it was fooled into thinking that perhaps the agency had in mind the more selective, benign communications offered by 15.306(a) or (b), the solicitation is not so limited.  The potential for mischief should have been apparent.  In any event, the solicitation did not contemplate use of a competitive range, which is presumed under section 15.306(b) and (d), another dissonance which RMMM should have picked up on.

Plaintiff responds that *Dubinsky v. United States*, 43 Fed. Cl. 243 (1999), stands for the proposition that a solicitation conducted pursuant to FAR Part 13, must also comply with the procedural requirements of FAR 15.306 and FAR 15.307, as "it is not 'appropriate' for an agency to cherry-pick which FAR Part 15 procedures to apply."  Pl. Mem. at 22-23 (citing *Dubinsky*, 43 Fed. Cl. at 264).  The facts of *Dubinsky* are distinguishable, however.  The agency in that case did not inform offerors that the agency was using SAP under FAR Part 13, nor did the solicitation specifically warn bidders of the possibility of exchanges with some bidders.  As a result, the

---

[6] The GAO has found that it was "not legally objectionable" for a CO to follow a provision of a solicitation that reserved the right to conduct discussions with any or all offerors, even where that solicitation was issued pursuant to FAR 13.  Oregon Innovative Products, B- 231767, 1988 WL 227585 (Comp. Gen. Aug. 2, 1988).  We agree.

[7] *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

*Dubinsky* court was "obligated to analyze the agency's conduct under the rubric of Part 15." *Id.*  The court noted that "[i]f simplified procedures under Part 13 had been utilized, then many of plaintiff's concerns about the conduct of discussions in this procurement would be irrelevant," because "[t]he simplified acquisition procedures in Part 13 allow contracting officers considerable flexibility in the contract award process." *Id.* at 254.[8] Of course such simplified procedures were called out in this procurement.

In short, the agency may have announced the creation of a platypus of a procurement, drawing bits and pieces from various practices, but RMMM cannot legitimately complain that it had reason to be surprised at what actually happened.  Alternatively, RMMM was on notice that the agency had created what it argues now is a potentially illegal syncretism of processes.

B. The Agency Rationally Evaluated MedExpress's Technical Capability Volume

RMMM argues that because the solicitation limited the technical volume to six pages and warned that quotes not meeting the solicitation requirements "may be considered non-compliant," the agency should have considered MedExpress's proposal as non-compliant for exceeding the page limit.  AR 245.  While the CO removed MedExpress's introductory letter before referring the technical proposal to the TET, RMMM argues that the proper response should have been to disqualify the entire proposal or evaluate only the first six pages of the total submission.  Pl's Mem. at 39 (citing *Board of Regents of Nev. Sys. of Higher Educ. on Behalf of Desert Res. Inst. v. United States*, 132 Fed. Cl. 435, 452 (2017)).  RMMM asserts that it was prejudiced because MedExpress's introduction letter provided a description of MedExpress's experience with similar projects, its technical capabilities, and approaches to ambulance service performance.

The government responds that the agency enforced the page requirement for the technical capability volume because the CO submitted

---

[8] In its reply, plaintiff argues that the court's alternative holding in *Dubinsky* supports its argument that the Air Force was required to follow FAR Part 15. We disagree.  In *Dubinsky*, the court alternatively found that even if that procurement was conducted under FAR Part 13, FAR 15.307(b) would apply because "defendant conceded that FAR 15.306 applied." *Dubinsky*, 43 Fed. Cl. at 263.  The court held that, having conceded that FAR 15.306 applied to that procurement, the agency could not sever the applicability of FAR 15.307(b).  Here there was no such concession.

the copy of MedExpress's technical capability volume, but not the introductory letter. Indeed, plaintiff concedes that there is no indication in the record that the agency ever reviewed the introduction letter. Pl's Mem. at 38. The government also argues that there is no authority limiting the Air Force to either rejecting the proposal or lopping the last three pages off.

We agree with the government. The CO was reasonable in enforcing the page-limit requirement by discarding MedExpress's introductory letter prior to sending the balance to the evaluators.[9] In the absence of any evidence that the introductory letter impacted the evaluation, the letter of introduction did not give MedExpress any advantage over the others.[10]

## C. The Air Force Rationally Found MedExpress's Past Performance Relevant

RMMM asserts that the Air Force irrationally found that the past performance reference for MedExpress's LRAA contract was relevant, resulting in an irrational overall performance confidence assessment rating for MedExpress. RMMM argues that the agency failed to show adequate justification for its decision that MedExpress's LRAA past performance reference satisfied the relevancy requirement. RMMM also asserts that the agency relied on MedExpress's description of its work performed under the LRAA contract, without conducting its own investigation to verify its relevancy.

RMMM contends that MedExpress's LRAA contract was not relevant under the solicitation's definition, which defined relevancy as "a past or present past performance effort involving similar scope, magnitude, and complexity of effort as this solicitation." AR 256. RMMM argues that there are several issues with MedExpress's LRAA contract, causing the past

---

[9] Plaintiff's argues in its reply that the Air Force's "acceptance of MedExpress's noncompliant proposal," constituted an inconsistent application of the solicitation requirements because the Air Force required Contractor A to revise its noncompliant proposal. Pl's Reply at 18. (ECF No. 40 at 18). By disregarding the introductory letter, however, the Air Force enforced the page-limit requirement.

[10] In *Board of Regents*, the CO's decision to include the preliminary materials in the page limit rather than excluding them, was in accordance with the solicitation and the decision thus does not represent a controlling rule of procurement law. *Board of Regents*, 132 Fed. Cl. at 452.

performance to fall short of the solicitation's definition requirement that the contract be similar in magnitude and complexity.

First, RMMM argues that although MedExpress's past performance volume indicated that the price of the LRAA contract was "[         ] per day," the volume lacked detail on the number of days included in the contract performance.  AR 489.  It points out that the LRAA contract reference, [         ], stated that the LRAA "activated [its] contract with Med Express over seven times in the last 3 years," without, however, providing any further information on the total number of days of contract performance.  AR 320. Plaintiff argues that the agency did not explain how it came to the conclusion that the contract's total dollar value was over [         ].  Thus, RMMM contends that there was no basis to conclude that the LRAA contract was similar in magnitude to the solicitation.

RMMM also argues that MedExpress's LRAA contract lacks the same "complexity of effort" required by the solicitation's relevancy definition.  RMMM states that the only similarity between the two contracts is that they are both for ambulance services.  RMMM argues that the LRAA contract and the current solicitation are dissimilar, as the LRAA was for as services as needed and was an augmentation to the services of other entities, whereas the present solicitation requires the contractor to be the sole provider of services 24 hour per day services, every day of the year.  Additionally, the LRAA contract was not providing services at a federal facility, while this solicitation requires services to be provided at a military installation.  Thus, plaintiff argues that the agency's relevancy assessment of the LRAA contract was arbitrary and capricious.

RMMM thus concludes that MedExpress's past performance volume only provided one relevant reference, disqualifying it from receiving a "substantial confidence" rating.  Instead, because MedExpress's LRAA past performance reference was not relevant to the solicitation, it should have been assessed a "neutral confidence" rating.

We disagree.  The agency's evaluation of MedExpress's past performance LRAA contract reference was rational.  First, the solicitation points out that "The past performance assessment [is] subjective."  AR 255. While the determination is subject to a review for reasonableness, the Federal Circuit has held that an agency's "determination of relevance is owed deference as it is among 'the minutiae of the procurement process,'" which this court "'will not second guess.'"  *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 911 (Fed. Cir. 2013) (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)).

RMMM's claim that the agency's determination of the LRAA contract's total dollar value was not supported by the record is refuted, as it conceded during oral argument, by the amended record which includes MedExpress's statement that the LRAA contract's total dollar value was [ ] as of August 27, 2020.  AR 831.  As to RMMM's assertion that the LRAA effort is not similar in complexity to this solicitation, this solicitation does not define complexity, and the agency's relevancy assessment was within its discretion and not unreasonable.  In the CO's view, MedExpress's LRAA contract was relevant because the LRAA's description of work and dollar value matched the solicitation's requirements of complexity of effort, magnitude, and scope:

> [T]he primary services of both efforts is the provision of medical transportation and support services. It is apparent that [MedExpress's] reference involves the very type of medical services contemplated by the [solicitation]. Additionally, both efforts require the awardee to provide qualified personnel and to comply with applicable professional standards and license requirements.

AR 448.  We have no basis for overturning this assessment.

While RMMM argues that the record "contains no explanation, contemporaneous or otherwise" of the agency's decision for evaluating MedExpress's past performance for relevancy, the record documents the pertinent facts leading to the agency's decision.  Pl.'s Mem. at 34.  The agency developed a chart to evaluate the recency of each offeror's past performance.  The chart had two columns detailing factors that the agency used to determine whether each past performance reference was relevant, the citation's description of work and total dollar value.  For the description of work column, the agency noted that the LRAA contract required MedExpress to provide emergency medical services "in the form of Ambulance Services and personnel in the time of a disaster and in corporation with Federal, State, and Local Government," and the most recent emergency was a "response to COVID pandemic in New Orleans."  AR 503.  For the total dollar value column, the agency noted that the LRAA contract's value was "[             ] YTD 2020/ [          ] per unit, per day, as required for disaster relief efforts." AR 503.  After reviewing all of the pertinent information provided by MedExpress including the responses from the LRAA reference, [           ], the agency determined that the LRAA contract was relevant because the LRAA's description of work and total dollar value matched the solicitation's requirements of complexity of effort, magnitude, and scope.

There is no legal support for RMMM's argument that the agency should have conducted an independent verification of the LRAA contract for relevancy, rather than relying solely on MedExpress's past performance volume and [          ] responses.  Even if the solicitation did require an independent investigation, which it does not, RMMM fails to acknowledge that the agency did conduct independent research; the past performance evaluation was based on the responses of the past performance reference citations that each offeror submitted, and any other information that the government obtained independently, including the government's CPARS/PPIRS reports.  In fact, MedExpress's "substantial confidence" past performance rating was "based on information assessed as provided by the references and/or information available in CPARS/PPIRS reports as part of an independent Government assessment."  AR 495.

Plaintiff concedes that the government correctly recognized that the solicitation did not only define "relevant," but also provided a definition for "not relevant."  The solicitation defined "not relevant" as a "present or past performance effort involving little or none of the scope and magnitude of effort as this solicitation."  AR 256.  The binary nature of the relevance determination means that only those past performance efforts involving "little or none" of the scope and magnitude of effort of the solicitation are not relevant.  Thus, the agency's relevancy assessment was rational, as the agency could not conclude that the LRAA reference involved "little or none of the scope and magnitude of effort" as compared to the solicitation, such that the effort was "not relevant."  AR 256.

D. The Agency's Evaluation of Contractor D's Past Performance Assessment did not Prejudice RMMM

We will assume for argument's sake that the agency's past performance evaluation of Contractor D was contrary to the solicitation, which required each contractor to submit two references, and that both references had to be "recent" and "relevant."  AR 249.  Contractor D remained in the competition despite the agency's rejection of one of its past performance references as, among other things, irrelevant.  RMMM states that if RMMM knew that the agency would deviate from the evaluation criteria, RMMM would have prepared its past performance volume differently by omitting the reference for the SAFB contract which resulted in an adverse rating and argues that it would have received a higher overall performance confidence rating if the agency only evaluated its USAFA contract past performance reference.

Plaintiff's argument would have more traction if Contractor D had been selected for award. But it was not. At the end of the day, plaintiff was not competing against Contractor D, it was competing against MedExpress, which did submit two relevant past performance references. For a protestor to prevail in a bid protest, it must show that, absent the alleged error, there would be a reasonable likelihood of the protestor receiving the contract. *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 695 (2010). Even if Contractor D received a "neutral confidence" rating, it would not affect the agency's decision that MedExpress's proposal presented a better value to the government than RMMM's proposal. We therefore fail to see the prejudice to plaintiff nor any basis for taking the award away from intervenor.

Trying to reconstruct the procurement in light of the agency's apparently erroneous treatment of Contractor D would be highly unfair to MedExpress and would necessarily involve accepting a contrived and highly speculative scenario. It involves an assumption that, if RMMM had known that it could get by with one reference, it would have deleted the problematic one, and that the agency would treat that one reference as so superior that, like Contractor D, it would vault RMMM's assessment to "outstanding." Presumably others would have had the same opportunity, however, further muddying a conclusion that the result would have been different. It is much simpler to deal with the undisputed facts: MedExpress and RMMM were the two finalists; both were given the opportunity and obligation to furnish two past performance references; the agency was impressed with intervenor's prior performances and justifiably concerned about plaintiff's. Even assuming a foul up with respect to Contractor D, that fact was an irrelevant sideshow.

CONCLUSION

Plaintiff asserts that the agency erred in several ways, and that collectively, these mistakes warrant the court's intervention on a theory that the whole (a general verdict of unfairness) is greater than the sum of its parts. We are not permitted to take a gestalt approach to bid protests, however. To overturn an agency action, we must find a discrete, prejudicial error. This may not have been a textbook procurement, but none of the alleged errors individually or collectively permit the court to reverse. Therefore, no relief is warranted, and we deny plaintiff's motion for judgment on the administrative record and grant defendant's cross-motion. The Clerk of Court is directed to enter judgment for defendant. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge